ISAACS BERNSTEIN, P.C.
Jonathan A. Bernstein
Lisa Isaacs
Attorneys for Plaintiff
2108 Yardley Road
Yardley, Pennsylvania 19067
(917) 693-7245

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BARBARA MORAES,                                        :
                                                       :    21 Civ. 4743
                              Plaintiff,               :
                                                       :
            - against -                                :    **COMPLAINT AND**
                                                       :    **DEMAND FOR JURY TRIAL**
APRIL MACKENNA WHITE and ALEXANDER  :
WILKE WHITE,                                           :
                                                       :
                              Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

　　　Plaintiff Barbara Moraes, by her attorneys, Isaacs Bernstein, P.C. and Crumiller P.C., as

and for her complaint against Defendants April Mackenna White and Alexander Wilke White,

alleges:


## NATURE OF THE ACTION

　　　1.　Barbara Moraes worked for April Mackenna White and her husband, Alexander Wilke

White, as their nanny for just short of a year. The Whites fired Moraes, as was their right.

However, they were not satisfied with simply letting her go. They did not want her to have any

contact whatsoever with their three-year-old son. After a happenstance encounter in a public park,

Mr. White called Moraes and instructed her not to speak to the child. Moraes agreed.

　　　2.　Yet that was not enough for the Whites. They sought to banish Moraes from Chelsea

altogether through extralegal intimidation and scare tactics.

3.  Ms. White posted to social media false statements that Moraes had behaved in a way that caused her and her husband concern for her son's safety. When that post was blocked as inappropriate, Ms. White reposted it to another group. The Whites, through counsel, sent Moraes a letter threatening legal action if she entered Chelsea Green. They sent an "investigator" to Moraes's home to intimidate and threaten her. When word of Ms. White's edict and her family's threats reached Moraes's new employer, the new employer told Moraes she was "uncomfortable with the situation" and fired her.

4.  Moraes had, to that point, enjoyed an excellent reputation for her work caring for children in Chelsea. However, the wide dissemination of the Whites' attacks on Moraes's professional fitness, their procurement of Moraes's dismissal from her subsequent employment and their agents' increasingly menacing visits to Moraes's home confirmed her fears that her employment prospects had been ruined. Moraes had no choice but to leave New York.

5.  The Whites failed and refused to pay Moraes overtime premium pay for the hours she worked in excess of 40 per week during her employment.

6.  The Whites' actions not only shock the conscience, especially as Ms. White is a member of the bar of this Court, they also entitle Moraes to civil relief. Accordingly, Moraes seeks relief for libel per se, tortious interference with contract and intentional infliction of emotional distress under the common law of New York, and for unpaid overtime premium pay and notice violations pursuant to the New York Labor Law.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1), which

2

confers original jurisdiction upon this Court over a civil action brought by a citizen of one State against a citizen of another State to recover damages in excess of $75,000.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), inasmuch as a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## PARTIES

8.   Plaintiff Barbara Moraes is a natural person residing in the City of Newark, County of Essex, State of New Jersey.

9.   Defendants April Mackenna White and Alexander Wilke White are natural persons married to each other and residing in the City, County and State of New York. The Whites together employed Barbara Moraes as their child's nanny from August 2019 until July 2020.

## FACTS COMMON TO COUNTS I-V

### Background

10. In 2017, Barbara Moraes, a Brazilian immigrant, moved from Ohio to New York to pursue her education. She found work as a nanny caring for young children in the Chelsea neighborhood of Manhattan. She received excellent references from the families for whom she worked in Chelsea as well as the family for whom she had worked in Ohio.

11. The Whites hired Barbara Moraes as their son's nanny in August 2019. For nearly a year, the employment relationship was mutually satisfactory. Moraes and the boy, W.W., were fond of each other; Ms. White and Moraes developed a relationship of cordiality and confidence.

3

12. In April 2020, Moraes was the victim of a violent crime. In the immediate aftermath of that crime, she experienced feelings of extreme sadness. After a three-day hospitalization, she was diagnosed with and treated for post-traumatic stress disorder.

13. At first, Ms. White was kind to Moraes, as she had been in the past.

14. In July 2020, Moraes accompanied the White family to their beach house in Southold, Long Island for several days. During that stay, she confided in Ms. White about how she had been struggling in the aftermath of the attack, including that she had been receiving treatment. Ms. White terminated Moraes's employment, effective immediately, and called for a car to return her to her Queens apartment. She did not permit Moraes to say goodbye to W.W.

15. Moraes asked Ms. White for a letter of reference. Ms. White acknowledged that Moraes had been a "wonderful caretaker" and agreed to provide a good reference but warned Moraes that she would also describe the events of the weeks leading to her termination. Moraes objected that she was entitled to confidentiality regarding the crime and her resulting emotional state.

16. The following month, Moraes sent Ms. White a letter acknowledging Ms. White's generosity and apologizing if she seemed distant, rude or ungrateful in the aftermath of the crime committed against her.


**Ms. White's Son Approaches Moraes in the Park**

17. On August 20, 2020, W.W. and his new nanny went to Chelsea Green, a public park, and saw that Moraes was also in the park. W.W., accompanied by the new nanny, ran over to Moraes and hugged her. The three of them sat together for a time on a park bench.

18. That evening, Alexander White phoned Moraes and directed her to have no further

4

contact with W.W. Moraes was surprised by his negative tone. She was disappointed, given her fondness for the child. She also wished to avoid engaging in any behavior that might be perceived by W.W. as rejection toward him. Nevertheless, she agreed to comply with Mr. White's demand.

### The Whites Threaten Legal Action Against Moraes
### <u>In a Way Calculated to Cause Her Distress</u>

19. Several days later, on August 25, 2020, Moraes heard a loud and persistent banging on her apartment door. She was frightened and surprised; her visitor had to have sneaked into the building.

20. The man continued to bang on her door for approximately 20 minutes. Moraes finally relented and opened the door. He asked to enter the apartment; Moraes refused to allow him into the apartment. The man said that he was there on behalf of the Whites.

21. The man identified himself as Santiago Batista, the Managing Director of Guidepost Solutions (which firm, upon information and belief, had been retained by Ms. White's law firm for the purpose). He said that they were asking Moraes "nicely" to have no contact with the White family, that they were being "nice" because "they cared about you," that "you are a young person, you're an immigrant, you don't have to jeopardize your future here," and that "we hope you can continue to live and work here and there is no problem."

22. Moraes felt shaken. Mr. Batista said that this was not a threat and that he was there to send her a message. He handed Moraes a letter from Lewis Baach Kaufmann Middlemiss, PLLC, Ms. White's firm, dated August 25, 2020. The letter states, in relevant part:

> You shall cease and desist from attempting to have any contact or
> communication with April Mackenna White, Alexander Wilke
> White, and [W.W.] Your failure to abide by this direction will lead to

5

<u>legal consequences.</u>

\*\*\*

You are hereby informed that your unwanted prior actions and communications have caused the White family tremendous stress, annoyance and alarm. They wish to have absolutely no contact with you … Nor should you approach or come to the same area as [W.W.] …  I have filed a report of your communications and behavior with the Manhattan District Attorney and the police, along with a copy of this letter … if you contact or attempt to contact Mr. and Mrs. White, or [W.W.], at any time in the future, I will request that you be arrested and prosecuted to the full extent of the law. Please leave the White family alone and move on with your life – it is in everyone's best interest.

(Emphasis in original.) A redacted copy of the letter is annexed as Exhibit 1.

23. Moraes was shocked. She had had no interactions with W.W. other than the happenstance encounter in the park the day of Mr. White's phone call to her.

24. She resolved to avoid any further interactions with the Whites and endeavored to move on.

25. In early October 2020, Moraes found work as a nanny for the Cohen-Glassbergs, a family in the Chelsea neighborhood. For the first three months, everything went well.

26. However, on or about January 7, 2021, Ms. White posted on "Madison Square Moms," a 2,300-person Facebook group of which Ms. Cohen was also a member. In the post, Ms. White not only lied about why Moraes had been fired, but fabricated a narrative of Moraes's purported post-termination conduct:

It pains me to write this post but I don't feel I have a choice as it concerns that [sic] safety of my family. Our former nanny Barbara Moraes ("Barb"), who is well known to many people in the neighborhood, has taken a position with a family in the Madison Square Park area. We understand she is leaving and looking for another job nearby. Barb worked for us from July 2019 to July 2020.

6

> Although we cared for Barb, we were forced to terminate her
> employment due to behavior that caused us concern for the safety of
> our son. But it didn't stop there. Her behavior following her
> termination left us no choice but to hire an attorney and file a
> criminal report for harassment and stalking our son. We were told
> that she would not seek employment in the area. Based on that
> understanding we did not seek a restraining order against her.
> Unfortunately we have learned that not only is she working in the
> area she is frequenting parks where she knows our son goes when he
> is likely to be there. Her presence in the neighborhood alarms us
> given her past behavior toward our family. Please DM me if you
> have any additional information. Wishing a happy and safe 2021 for
> all.

A copy of the "Madison Square Moms" post by Mackenna White is annexed as Exhibit 2.


**Ms. White's Defamatory Facebook Post is Removed; She Reposts the Offending Message**

27. At this point, Moraes had had no interactions with the Whites since the phone call she received from Mr. White months earlier. Ms. White's continuing fixation with her was not only baffling but appeared increasingly unhinged.

28. Shortly thereafter, Ms. Cohen sent a text message to Lane Kulka, the administrator of the Madison Square Moms Facebook group. The message read, in relevant part:

> This mom posted about our current nanny. I understand that there are
> two sides to every story but we are very happy with her. I too have
> had safety issues with previous nannies but never posted their names
> or defamed them. I know one of Barb's previous employers who is
> also part of the group who recommended her to me and we have both
> been nothing but happy. In today's world with all the hate around us
> I do not think it is the purpose of this amazing group to spread
> defamation. My mom was with Barb when this supposed issue
> happened and it was nothing more than a little boy who liked his
> former nanny saying hi.

29. Upon information and belief, Lane Kulka contacted Ms. White at or about that time and advised her of Ms. Cohen's text message and that the post quoted in Paragraph 26 was being taken

down for violation of the Madison Square Moms group's terms of service.

30. The post quoted in Paragraph 26 was taken down from the Madison Square Moms Facebook page the following day.

31. Upon information and belief, Ms. White made no attempt to contact Ms. Cohen's mother, who also lives in Chelsea.

32. Two days later, Ms. White re-posted the same content to Chelsea Mommas, a Facebook group with over 6,000 members. The new post is substantially identical to the post quoted in Paragraph 26, with one addition: "[w]e have no reason to believe she is violent or a danger to anyone else."

33. That post, a copy of which is annexed as Exhibit 3, remains on the Chelsea Mommas Facebook page.

## The Whites Renew Their Threats and Embarrass Moraes Publicly

34. Early in the morning of January 12, 2021, a man and a woman claiming to have been acting in the name of the Whites sneaked into Moraes's building and banged loudly on her door for almost two hours. Moraes having refused to open the door, the man followed Moraes to the subway, all the while continuing his harangue and causing Moraes alarm and distress. When she returned to her apartment, she discovered that someone (presumably the woman who had sneaked into her building) had taped to her door a letter from Adam Kaufmann, Ms. White's law partner, dated January 11, 2021.

35. The letter stated:

Ms. Moraes:

I write again on behalf of my clients Mackenna and Alexander White regarding your continued presence in their neighborhood and your recent interaction with their son, [W.W.] My last communication with you in August 2020 made very clear that you were to have no further contact with my clients or [W.W.] I also told you that your conduct has already been reported to the police, but my clients requested that the police refrain from arresting you.

Now it seems you have made contact with [W.W.] once again. You have visited the park where you know [W.W.] regularly plays. You know [W.W.]'s routine and where he regularly goes to play. We again direct you to stay away from [W.W.] and have no further contact with him.

We have spoken to your former employer (prior to the White family) who told us they also were forced to fire you because of problematic and disruptive behavior, and the subsequent to your dismissal you stalked and harassed that family as well. This is a disturbing pattern. Even more disturbing, we now know that you used [W.W.] as part of your scheme to stalk and harass that family, just as you are now using your current employer's daughter to stalk and harass the Whites.

**If you have any further contact with [W.W.], we will immediately report your conduct to the police and the District Attorney. You should understand that having been warned to stay away from my clients and their family, if you contact them again you may be committing the crime of Stalking under New York law, and my clients will seek to have you arrested and criminally prosecuted.**

We request that you not go to Chelsea Green (on West 20th Street between Sixth and Seventh Avenues). There simply is no reason for you to go to my client's neighborhood or that particular park knowing that your presence there will bring you into contact with [W.W.] There are many parks in New York City; please choose a different one.

We will not caution you again. Please respect my client's wishes and cease from having contact with their son.

Very truly yours,
/s/
Adam S. Kaufmann

9

A redacted copy of that letter is annexed as Exhibit 4.

36. The letter was taped to the outside of the door for Moraes's neighbors to read.

37. None of the statements in the letter were true. Moraes still had not had any contact with W.W. since before the call from Mr. White on August 20, 2020. Nor had she ever been fired for "problematic and disruptive behavior."

38. Moraes became increasingly fearful. Unsure where else to turn, she described the letter to her employer, Jillian Cohen.

39. Upon information and belief, Ms. Cohen had spoken to Mackennna White in the preceding days.

40. For no reason other than her fear of becoming involved in the Whites' harassment campaign, Cohen terminated Moraes's employment. She posted to the Facebook group:

> We had to part ways unexpectedly today with our current nanny due to a problem she was having with her previous employer. She received a cease and desist order this morning and a restraining order is following. It is unfortunate as our daughter loved her and she was very nice but we did not feel comfortable with the drama and situation. …

41. The Whites succeeded in their aims. Moraes, knowing she could no longer find employment in Chelsea, and fearing for her safety even at her home, fled New York.

## COUNT I – LIBEL PER SE

42. Plaintiff incorporates by reference Paragraphs 1 through 41 of this Complaint as though the same were fully set forth herein.

43. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook

10

group are defamatory.

44. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group refer to Barbara Moraes.

45. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were published to third parties.

46. Following the termination of Moraes' employment, Ms. White acknowledged in writing that Barbara Moraes had been a "wonderful caretaker."

47. In her post to the Madison Square Park Moms Facebook group on or about January 9, 2021, Ms. White admitted that "we have never seen [Barbara Moraes] exhibit violent behavior and we have no reason to believe she is a danger to anyone else."

48. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were made without privilege.

49. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were made negligently.

50. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were made with knowledge of the falsity thereof.

51. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were made with reckless disregard of the truth or falsity thereof.

52. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group were made with common-law and/or constitutional malice.

53. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group tend to injure Barbara Moraes in her trade, business or profession.

11

54. The statements made in the January 7, 2021 post to the Chelsea Mommas Facebook group caused Barbara Moraes emotional distress.

55. Defendant April Mackenna White is accordingly liable to Plaintiff Barbara Moraes for compensatory and punitive damages in an amount not presently ascertainable, no less than $75,000.01.

## COUNT II – LIBEL PER SE

56. Plaintiff incorporates by reference Paragraphs 1 through 55 of this Complaint as though the same were fully set forth herein.

57. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 are defamatory.

58. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 refer to Barbara Moraes.

59. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 were published to third parties.

60. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 were made without privilege.

61. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 were made negligently.

62. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 were made with knowledge of the falsity thereof.

63. The statements made in the post to the Madison Square Park Moms Facebook group on

or about January 9, 2021 were made with reckless disregard of the truth or falsity thereof.

64. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 were made with common-law and/or constitutional malice.

65. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 tend to injure Barbara Moraes in her trade, business or profession.

66. The statements made in the post to the Madison Square Park Moms Facebook group on or about January 9, 2021 caused Barbara Moraes emotional distress.

67. Defendant April Mackenna White is accordingly liable to Plaintiff Barbara Moraes for compensatory and punitive damages in an amount not presently ascertainable, no less than $75,000.01.


## COUNT III – LIBEL PER SE

68. Plaintiff incorporates by reference Paragraphs 1 through 67 of this Complaint as though the same were fully set forth herein.

69. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann are defamatory.

70. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann refer to Barbara Moraes.

71. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were published to third parties.

72. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were made without privilege.

13

73. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were made negligently.

74. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were made with knowledge of the falsity thereof.

75. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were made with reckless disregard of the truth or falsity thereof.

76. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann were made with common-law and/or constitutional malice.

77. The statements made in the second and third paragraphs of the January 11, 2021 letter from Adam S. Kaufmann tend to injure Barbara Moraes in her trade, business or profession.

78. The statements made in the January 11, 2021 letter from Adam S. Kaufmann were made within the scope of his employment for Defendants.

79. The statements made in the January 11, 2021 letter from Adam S. Kaufmann caused Barbara Moraes emotional distress.

80. Defendants are accordingly liable to Plaintiff for compensatory and punitive damages in an amount not presently ascertainable, no less than $75,000.01.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT

81. Plaintiff incorporates by reference Paragraphs 1 through 80 of this Complaint as though the same were fully set forth herein.

82. As of October 7, 2020, a valid employment contract existed between the Cohen-Glassberg family and Barbara Moraes.

14

83. April Mackenna White had knowledge of the contract between the Cohen-Glassberg family and Barbara Moraes.

84. Ms. White intentionally and improperly procured the breach of the contract.

85. That breach resulted in damage to Moraes, *i.e.*, the loss of employment.

86. Moraes has accordingly been damaged in the amount of her lost wages with interest thereon since January12, 2021.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

87. Plaintiff incorporates by reference Paragraphs 1 through 86 of this Complaint as though the same were fully set forth herein.

88. Santiago Batista and the persons described in Paragraph 34 of the Complaint were agents of Defendants acting within the scope of their agency.

89. The conduct of Defendants and their agents as described herein, including, without limitation, publicly humiliating Barbara Moraes, accusing her of heinous conduct in two internet forums known to be read by her potential clientele, threatening to enlist law enforcement and immigration authorities, and demanding that Moraes leave Chelsea, is extreme and outrageous.

90. Defendants acted with the intent to cause, or reckless disregard of a substantial probability of causing, Moraes severe emotional distress, which emotional distress in fact resulted.

91. Defendants had actual knowledge of Moraes's emotional state at the time they undertook the outrageous conduct described in this complaint.

Defendants are accordingly liable for compensatory and punitive damages in an amount not presently ascertainable, no less than $75,000.01.

15

## COUNT VI – NEW YORK LABOR LAW

92.   Plaintiff regularly worked in excess of 40 hours in the workweek but was not paid lawful overtime premium pay for all work hours in excess of 40 hours per workweek as required by the New York Domestic Workers' Bill of Rights, N.Y. Labor Law § 170, and N.Y. Minimum Wage Act, as amended, N.Y. Labor Law §§ 650 *et seq.* and regulation promulgated thereunder, 12 NYCRR § 142-2.2.

93.   Upon information and belief, Defendants failed to make, keep and preserve records as required by N.Y. Labor Law § 195(4).

94. Moraes is accordingly entitled to back pay, liquidated damages, prejudgment interest, the costs of this action and attorney's fees.

## COUNT VII – NEW YORK LABOR LAW

95. Plaintiff incorporates by reference Paragraphs 92 through 94 of this Complaint as though the same were fully set forth herein.

96. Defendant failed to provide Moraes the notice required by N.Y. Labor Law §195(1)(a).

97. Moraes is accordingly entitled to damages of $50.00 per work day, to a maximum of $5,000, for the failure to give notice, as well as costs of this action, prejudgment interest, and reasonable attorney's fees pursuant to NYLL § 198 (1-b).

## COUNT VIII – NEW YORK LABOR LAW

98. Plaintiff incorporates by reference Paragraphs 92 through 97 of this Complaint as though the same were fully set forth herein.

99. Defendants failed to provide Plaintiff the statements required by N.Y. Labor Law § 195(3).

100.   Plaintiff is accordingly entitled to damages of $250.00 per work day, to a maximum of $5,000.00, for the failure to provide the required statements, as well as costs of this action, prejudgment interest, and reasonable attorney's fees pursuant to NYLL § 198(1-d).

## PRAYER FOR RELIEF

WHEREFORE, Barbara Moraes respectfully prays that this Court:

a.   Declare Defendants' acts and practices complained of herein to be in violation of Moraes's rights as secured by the common law of New York;

b.   Grant a permanent injunction enjoining Defendants and their employees, agents, attorneys, successors and assigns and those acting in concert therewith from any conduct violating Moraes's rights as secured by the common law of New York;

c.   Award Moraes compensatory damages to be determined at the time of trial by the jury;

d.   Award Moraes punitive damages to be determined at the time of trial by the jury;

e.   Order Defendants to make Moraes whole by providing her appropriate lost earnings and benefits from January 9, 2021, together with pre-judgment interest and other affirmative relief including but not limited to front pay;

f.   Award Moraes overtime premium pay, with liquidated damages thereon, pursuant to the New York Minimum Wage Act;

g.   Award Moraes $5,000.00 for the failure to provide wage notice pursuant to N.Y.

17

Labor Law § 195(1);

    h.  Award Moraes $5,000.00 for the failure to provide wage statements pursuant to N.Y.

Labor Law § 195(3);

    i.  Award Moraes pre- and post-judgment interest;

    j.  Award Moraes reasonable attorneys' fees and costs incurred in prosecuting this

action; and

    k.  Grant such further relief as the Court deems necessary and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff requests a jury trial on all questions of fact raised by the Complaint.

Dated: Yardley, Pennsylvania
       May 26, 2021

                                    Respectfully submitted,

                                    ISAACS BERNSTEIN, P.C.

                              By:_____/s/_____

                                    Jonathan A. Bernstein
                                  Lisa Isaacs
                                  2108 Yardley Road
                                  Yardley, Pennsylvania
                                  (917) 693-7245
                                  jb@lijblaw.com

                                    CRUMILLER P.C.

                              By:_____/s/_____

Susan Crumiller
16 Court Street, Suite 2500
Brooklyn, New York 11241
(212) 390-8480
susan@crumiller.com

Attorneys for Plaintiff