UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BARBARA MORAES,

                                    Plaintiff,

                -v-

APRIL MACKENNA WHITE and ALEXANDER
WILKE WHITE,

                                    Defendants.

21 Civ. 4743 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves claims of defamation and tortious interference with contract by a

nanny, who alleges that her former employer defamed her as a stalker and harasser in social

media posts and cost her an existing nanny job.  Plaintiff Barbara Moraes ("Moraes") brings

three claims of defamation, one of tortious interference of contract, one of intentional infliction

of emotional distress, and three of violations of the New York Labor Law ("NYLL") against

April Mackenna White ("Ms. White") and Alexander Wilke White ("Mr. White") (together, the

"Whites").  These arise from Moraes' employment as nanny to the Whites' son, W., her

termination from that post, and from the Whites' alleged post-termination communications to

others about Moraes.

The Whites now move under Federal Rule of Civil Procedure 12(b)(6) for partial

dismissal—of the claims for defamation, tortious interference of contract, and intentional

infliction of emotional distress, but not those under the NYLL—for failure to state a claim.  For

the following reasons, the Court denies the Whites' motion in its entirety.

I.      **Background**

A.      **Factual Background**[1]

In 2017, Moraes, a Brazilian immigrant, moved from Ohio to New York to pursue her education. FAC ¶ 12. Moraes found work as a nanny caring for young children in Chelsea, Manhattan. *Id.* Moraes received excellent references from the families for whom she worked in Chelsea as well as the family for whom she had worked in Ohio. *Id.*

In August 2019, the Whites hired Moraes as a nanny for their son, W. *Id.* ¶ 13. For nearly a year, the employment relationship was mutually satisfactory. *Id.* Moraes and W. were fond of each other, and Ms. White and Moraes developed a relationship of cordiality and confidence. *Id.*

In April 2020, Moraes was the victim of a violent attack unrelated to her employment. *Id.* ¶ 14. In the immediate aftermath, Moraes experienced extreme psychological distress. *Id.* After a three-day hospitalization, Moraes was diagnosed with post-traumatic stress disorder. *Id.*

---

[1] This factual account draws from the First Amended Complaint, Dkt. 14 ("FAC"), and the exhibits cognizable to it. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). For reasons discussed herein, the cognizable exhibits include Exhibit A, in part, and Exhibits B and C, in full, appended to the declaration of Adam S. Kaufmann ("Kaufmann Decl."), Dkt. 17, submitted in support of defendants' motion to dismiss, Dkt. 15.

The Court here substantially disregards defendants' statement, in their memorandum in support of dismissal, of the purported facts, as it—in recounting various events and communications—strays far beyond the facts pled and the materials properly cognizable on a motion to dismiss under Rule 12(b)(6). *See* discussion *infra*, at 13–16, explaining why only a subset of the materials on which defendants rely are cognizable.

According to the FAC, Ms. White thereafter was initially "kind" to Moraes, as she had been in the past. *Id.* ¶ 15. However, that changed in summer 2020. In July 2020, Moraes accompanied the Whites to their beach house in Long Island for several days. *Id.* ¶ 16. During the trip, Moraes confided in Ms. White that she had been struggling in the aftermath of the attack, including that she had been receiving treatment. *Id.* The FAC alleges that after receiving this information, Ms. White terminated Moraes' employment immediately, and called for a car to take Moraes to her Queens apartment. *Id.* Moraes was not permitted to say goodbye to W. *Id.*

In a July 23, 2020 text message to Moraes, sent after her termination, Ms. White wrote regarding a recommendation, "I am happy to tell a potential employer what a wonderful caretaker you were. I cannot withhold what took place between us over the past few months, though I can tell them that up to your termination it did not impact the quality of your care." Kaufmann Decl., Ex. A.

On August 15, 2020, in an effort to seek closure, Moraes sent Ms. White a five-page letter about her behavior in the aftermath of her attack. Moraes stated:

> Asking for forgiveness is assuming responsibility in my actions, which I do. I never meant to hurt you. I never meant to make you cry but I know I made mistakes and I assume this. There is no pain that justifies more pain. Only I know how much I suffered and still do, however this is not a reason to make you suffer as well. I want to apologize for my immaturity, for not knowing how to be grateful—even though crying many times thanking God for having you—for my words that one day hurt you, for my angriness, for not knowing how to receive your love and support.
> . . . .
>
> I know that I can be part of Little's life in so many ways—and this is what I want most, but I also know and understand that there are situations that cannot be fixed. If this isn't the case, I ask you to reflect on how much I love him and would like to stop by to give him a hug here and there, FaceTime him or even take him for an adventure over the weekend, if you let me.

*Id.*, Ex. B; FAC ¶ 17. Moraes never received a response to her letter. FAC ¶ 19. Moraes did not make any further attempt to contact the Whites. *Id.*

On August 20, 2020, Moraes' friend, Ismenia, invited her and other nanny friends to meet at Chelsea Green for a picnic. *Id.* ¶ 20. This was convenient for Moraes, as she had planned to meet a friend for coffee in the neighborhood and to pick up a prescription at a pharmacy around the corner. *Id.*

While Moraes was chatting with friends at the picnic, W., accompanied by his new nanny, arrived at the park. *Id.* ¶ 21. According to the FAC, W. ran over to Moraes and hugged her. *Id.* Moraes sat with W. and his new nanny for a time on a park bench. *Id.*

That evening, Mr. White called Moraes. *Id.* ¶ 22. He told Moraes that "it's really inappropriate for you to be in our neighborhood, hanging around a park around the corner from our house, where we can only assume that you were there to try to see [W.]." *Id.*

According to the FAC, Moraes attempted to deny that she had been in the park to see W., but Mr. White spoke over her. *Id.* Mr. White also stated that "[i]f you care about [W.], you need to give him space and not let him be confused by your presence . . . . You know that [W.] will try to see you." *Id.* Moraes agreed, but expressed confusion as to what Mr. White expected her to do if she had other employment in the neighborhood. *Id.* The conversation transcript—which was tape-recorded by Mr. White—sets out this portion of their conversation:

> MR. WHITE: Barb, listen to us, I don't want to hear what you have to say. We did not respond to your request to spend time with him, we—because you cannot spend time with him. We are not in a place where it's okay for you to spend time with him. So, let's be very clear, stay away from [W.]. If you don't stay away from [W.] and you continue to be—put yourself in positions to try to see him, we will have to get the police involved.
>
> MORAES: Okay, then –
>
> MR. WHITE: You –
>
> MORAES: – you can do that, because like, I'm going –
>
> MR. WHITE: Barb –

MORAES: – to the park and (inaudible) –

MR. WHITE: – you are the ad–

MORAES: – again, because I'm gonna see my friend, and if your nanny arrives there, she needs to leave. Alec, you can't say –

MR. WHITE: Barb, –

MORAES: – that (inaudible).

MR. WHITE: – you are – Barb, you are the adult here, you are the adult here. You know that [W.] will try to see you, if you go to places where he is likely to be. If you are there, and try to see him, and don't leave, we will call the police.

MORAES: Okay.

MR. WHITE: Leave our family alone and give us space.

MORAES: I'm not around your family.

MR. WHITE: Give our family space. [W.] is our family, Barb.

MORAES: I understand that, –

MR. WHITE: [W.] is our family –

MORAES: – but now –

MR. WHITE: – you – [W.]

MORAES: – I can't, like, any – anytime on the street and I bump to him, or to you, or to (inaudible) –

MR. WHITE: Then walk the other way.

MORAES: – (inaudible).

MR. WHITE: Then walk the other way.

MORAES: But (inaudible) can't walk that way.

MR. WHITE: Go – cross the – cross the street and walk the other way. You don't need –

MORAES: (Inaudible).

WHITE: – to be in Flatiron or Chelsea.

> MORAES: Oh, yeah.  So, I have a job in Chelsea, so I'm not allowed to accept the job?
>
> MR. WHITE: Barb, you do not need to put yourself in a situation where you are close to [W].  We are telling you to stay away from him.  And if you can – if you put yourself in a position to be close to him, we are going to call the police.

*Id.* ¶ 23.  Later that evening, Moraes and the Whites communicated through an intermediary. According to the FAC, Moraes agreed to change her pharmacy and minimize the time she spent in Flatiron and Chelsea, to avoid antagonizing the Whites.  *Id.*

The FAC alleges that although Moraes was unsettled by the call, she assumed the issue had been resolved, as she had agreed not to have further communication with W. and to avoid the Whites as much as possible.  *Id.* ¶ 24.  At the time, this was not difficult for Moraes to agree to, because she had not secured new employment requiring her presence in a Manhattan neighborhood.  *Id.*

On August 25, 2020, five days after the phone call, Moraes heard a loud and persistent banging on her apartment door.  *Id.* ¶ 26.  Moraes was frightened and surprised, as she assumed whoever was banging had to have snuck into the building.  *Id.*  The man at her door continued banging for approximately 20 minutes, until Moraes relented and opened the door.  *Id.* ¶ 27.  The man asked to enter the apartment; Moraes refused.  *Id.*  The man identified himself as Santiago Batista ("Batista"), a managing director of the firm Guidepost Solutions.  Batista said that he was at Moraes' apartment on behalf of the Whites.  *Id.* ¶ 28.

According to the FAC, Batista told Moraes that the Whites were being "nice" because "they cared about you," that "you are a young person, you're an immigrant, you don't have to jeopardize your future here," and that "we hope you can continue to live and work here and there is no problem."  *Id.*  Batista stated that he was not at her apartment to threaten her or send her a message.  *Id.* ¶ 29.  Batista delivered to Moraes a letter from Lewis Baach Kaufmann

Middlemiss, PLLC, Ms. White's law firm, dated August 25, 2020.  The letter stated, in relevant

part:

> You shall cease and desist from attempting to have any contact or communication
> with [Ms. White], [Mr. White], and [W.]  Your failure to abide by this direction
> will lead to legal consequences.
> . . . .
> You are hereby informed that your unwanted prior actions and communications
> have caused the White family tremendous stress, annoyance and alarm.  They wish
> to have absolutely no contact with you . . . . Nor should you approach or come to
> the same area as [W.]. . . . I have filed a report of your communications and behavior
> with the Manhattan District Attorney and the police, along with a copy of this letter
> . . . if you contact or attempt to contact Mr. and [Ms.] White, or [W.], at any time
> in the future, I will request that you be arrested and prosecuted to the full extent of
> the law.  Please leave the White family alone and move on with your life—it is in
> everyone's best interest.

*Id.* ¶ 29.  The FAC alleges that Moraes felt "shocked" and "shaken" by the letter.  *Id.* ¶ 30.

Around the same time, the Whites filed a criminal complaint against Moraes for "stalking

and harassment."  *Id.*  The FAC alleges that, as of this time, Moraes had not had any contact with

W. other than the "happenstance" encounter on August 20, 2020.  *Id.*  After receiving the letter,

the FAC alleges, Moraes resolved to avoid the Whites and move on.  *Id.* ¶ 31.

Several weeks later, in early October 2020, Moraes was hired by a different family, the

Cohen-Glassbergs, as a nanny for their 18-month-old daughter.  *Id.* ¶ 32.  The Cohen-Glassbergs

lived in Chelsea, near the Chelsea Green park.  *Id.*

According to the FAC, the first three months of Moraes' employment with the Cohen-

Glassbergs went well.  *Id.* ¶ 33.  During those months, Moraes cared for the Cohen-Glassbergs'

daughter, did not interact with the Whites, and assumed that the Whites had moved on.  *Id.* ¶ 33.

On January 7, 2021, however, Ms. White posted on "Madison Square Moms," a 2,300-

person Facebook group of which Cohen, Moraes' new employer, was also a member.  *Id.* ¶ 34.

Ms. White's post stated the following:

It pains me to write this post but I don't feel I have a choice as it concerns that [sic] safety of my family. Our former nanny Barbara Moraes ("Barb"), who is well known to many people in the neighborhood, has taken a position with a family in the Madison Square Park area. We understand she is leaving and looking for another job nearby. Barb worked for us from July 2019 to July 2020. Although we cared for Barb, we were forced to terminate her employment due to behavior that caused us concern for the safety of our son. But it didn't stop there. Her behavior following her termination left us no choice but to hire an attorney and file a criminal report for harassment and stalking our son. We were told that she would not seek employment in the area. Based on that understanding we did not seek a restraining order against her. Unfortunately we have learned that not only is she working in the area she is frequenting parks where she knows our son goes when he is likely to be there. Her presence in the neighborhood alarms us given her past behavior toward our family. Please DM me if you have any additional information. Wishing a happy and safe 2021 for all.

The FAC alleges that in the post, Ms. White not only lied about why Moraes had been fired, but fabricated a narrative regarding Moraes' purported post-termination conduct. *Id.* ¶ 34. It alleges that, contrary to Ms. White's post, as of January 7, 2021, Moraes had not had any contact with the Whites since August 20, 2020 phone call, during which Mr. White had asked her not to contact them or their son. *Id.* ¶ 35.

The FAC alleges that the following three statements in Ms. White's Facebook post caused Moraes "confusion." First was the statement that Moraes was "leaving and looking for another job nearby." In fact, Moraes had, at that point, been working for the Cohen-Glassbergs for three months. *Id.* ¶ 36. Second was the statement that, "We were told that she would not seek employment in the area. Based on that understanding, we did not seek a restraining order against her." In fact, according to the FAC, Moraes had been unaware of the Whites having being told any such thing, or of any basis for them to seek a restraining order against her. Third was the statement that Moraes's "presence in the neighborhood alarms us given her past behavior toward our family." *Id.* ¶ 38. In fact, the FAC alleges, there was no reason for Moraes' presence to be viewed as alarming. *Id.*

Shortly after the post appeared in the Madison Square Moms Facebook group, Cohen—

Moraes' employer at the time—sent a text message to the group's administrator, Lane Kulka

("Kulka"). *Id.* ¶ 39. The message read:

> This mom posted about our current nanny. I understand that there are two sides to
> every story but we are very happy with her. I too have had safety issues with
> previous nannies but never posted their names or defamed them. I know one of
> Barb's previous employers who is also part of the group who recommended her to
> me and we have both been nothing but happy. In today's world with all the hate
> around us I do not think it is the purpose of this amazing group to spread
> defamation. My mom was with Barb when this supposed issue happened and it
> was nothing more than a little boy who liked his former nanny saying hi.[2]

*Id.* The FAC alleges, upon information and belief, that Kulka contacted Ms. White to advise her

of Cohen's text message, and that Ms. White's post was being removed for having violated the

group's terms of service. *Id.* ¶ 40. On January 8, 2021, the post was removed. *Id.* ¶ 41. The

FAC alleges, on information and belief, that Ms. White never contacted Cohen to learn from her

the facts involving W.'s supposed encounter with Moraes, despite Ms. White's having been put

on notice that her version of events was inaccurate. *Id.* ¶ 42.

A day later, on January 9, 2021, Ms. White posted substantially the same content to a

different Facebook group, "Chelsea Mommas," which has more than 6,000 members. *Id.* ¶ 43.

The new post was identical to the previous Facebook post, except that Ms. White added one line:

"We have no reason to believe she is violent or a danger to anyone else." *Id.*

On January 12, 2021, a man and a woman snuck into Moraes' apartment building and

banged loudly on her door for almost two hours. *Id.* ¶ 45. They told Moraes that they were there

---

[2] The FAC alleges that as of "this point [January 7, 2021], Moraes had had no interactions with
the Whites since the call she received from Mr. White months earlier," FAC ¶ 35, but Cohen's
message to Kulka, as quoted in the FAC, *id.* ¶ 39, suggests a later encounter between Moraes and
W. Specifically, it implies that Moraes and W. had had contact at some point after October 6,
2020, when Moraes began work for the Cohen-Glassbergs. In all events, the Court construes the
FAC to dispute that any post-employment encounter(s) between Moraes and W. were of the
stalking character implied by Ms. White's posts.

on behalf of the Whites. *Id.* Moraes refused to open her door, but eventually had to leave her apartment to go to work. *Id.* The FAC alleges that the man was waiting for Moraes outside her door and followed her to the subway, "all the while continuing his harangue and causing Moraes alarm and distress." *Id.* The FAC alleges that when Moraes returned to her building later that evening, she discovered that someone had taped to her door a second letter, describing itself as being from the Whites' attorney. The letter stated:

> Ms. Moraes:
>
> I write again on behalf of my clients [Ms. and Mr. White] regarding your continued presence in their neighborhood and your recent interaction with their son, [W.]. My last communication with you in August 2020 made very clear that you were to have no further contact with my clients or [W.]. I also told you that your conduct has already been reported to the police, but my clients requested that the police refrain from arresting you. Now it seems you have made contact with [W.] once again. You have visited the park where you know [W.] regularly plays. You know [W.]'s routine and where he regularly goes to play. We again direct you to stay away from [W.] and have no further contact with him.
>
> We have spoken to your former employer (prior to the White family) who told us they also were forced to fire you because of problematic and disruptive behavior, and that subsequent to your dismissal you stalked and harassed that family as well. This is a disturbing pattern. Even more disturbing, we now know that you used [W.] as part of your scheme to stalk and harass that family, just as you are now using your current employer's daughter to stalk and harass the Whites. If you have any further contact with [W.], we will immediately report your conduct to the police and the District Attorney. You should understand that having been warned to stay away from my clients and their family, if you contact them again you may be committing the crime of Stalking under New York law, and my clients will seek to have you arrested and criminally prosecuted.
>
> We request that you not go to Chelsea Green (on West 20th Street between Sixth and Seventh Avenues). There simply is no reason for you to go to my client's neighborhood or that particular park knowing that your presence there will bring you into contact with [W.]. There are many parks in New York City; please choose a different one. We will not caution you again. Please respect my client's [sic] wishes and cease from having contact with their son.
>
> Very truly yours,
>
> /s/ Adam S. Kaufmann

*Id.* ¶ 46.  The FAC alleges that the letter had been taped to Moraes' door, where anyone walking by, including building residents, could read it.  *Id.* ¶ 47.  It alleges that at least two people—Pedro Ayala, an employee of the apartment building, and Lena Lin, a resident—read the letter. *Id.*

The FAC alleges that various statements in the letter are untrue.  *Id.* ¶ 48.  According to the FAC, Moraes had not had any contact with W. since August 20, 2020, and had not been fired for "problematic and disruptive behavior." *Id.*

Moraes, "increasingly fearful," turned to her new employer, Cohen, about the letter.  *Id.* ¶ 49.  The FAC alleges that in the days preceding the letter, Cohen had spoken to Ms. White by phone.  *Id.* ¶ 50.  During their call, Ms. White told Cohen "falsehoods" such as "that Moraes had stalked and harassed her child as well as other children." *Id.*  The FAC alleges that Ms. White called Cohen with the goal of "procuring the termination of Moraes' employment at the Cohen-Glassbergs[']." *Id.* ¶ 51.  The FAC further alleges that Ms. White shared her husband's view that they were entitled to bar Moraes from employment in Chelsea.  *Id.* ¶ 52.

The FAC alleges that, for no reason other than fear of becoming drawn into the Whites' harassment campaign, Cohen thereafter terminated Moraes' employment.  *Id.* ¶ 53.  Cohen posted to the Facebook group:

> We had to part ways unexpectedly today with our current nanny due to a problem she was having with her previous employer.  She received a cease and desist order this morning and a restraining order is following.  It is unfortunate as our daughter loved her and she was very nice but we did not feel comfortable with the drama and situation . . . .

*Id.*  The FAC thus alleges that the Whites' campaign "succeeded" and that Moraes was no longer able to find employment in Chelsea.  *Id.* ¶ 54.  Fearing for her safety, Moraes fled New York.  *Id.*

As a result of the Whites' actions, the FAC alleges, Moraes suffers persistent anxiety and fear, for which she was prescribed medication, as well as insomnia and disordered eating.

B.     **Procedural History of This Action**

On May 27, 2021, Moraes filed her initial complaint, with attached exhibits. Dkt. 1. On July 26, 2021, the Whites moved to dismiss Moraes' tort (*i.e.*, non-NYLL) claims, and filed a declaration in support attaching exhibits. Dkts. 10–11.

On July 27, 2021, the Court ordered Moraes to file any amended complaint by August 16, 2021. Dkt. 12. On August 16, 2021, Moraes filed the FAC. Dkt. 14. On September 3, 2021, the Whites filed a motion to dismiss the FAC, with a memorandum of law and declaration in support, which again attached exhibits. Dkts. 15, 16 ("MTD"), 17 ("Kaufmann Decl."). On September 17, 2021, Moraes filed an opposition to the motion. Dkt. 18 ("Opp."). On September 24, 2021, defendants filed a reply. Dkt. 21.

On November 3, 2021, the Court held argument on the motion to dismiss. Dkt. 25.

II.     **Legal Standards Governing Motions to Dismiss**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"[T]here is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quotation marks and citation omitted); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

## III.   Discussion

### A.   Cognizability of Extrinsic Materials Attached to the Motion to Dismiss

At the threshold, the Court must determine to what extent the five exhibits defendants have appended to their motion to dismiss are cognizable on that motion.[3] *See* Kaufmann Decl., Exs. A–E.  These are: (1) a July 22, 2020 text message exchange between Moraes and Ms. White ("Exhibit A"); (2) an August 15, 2020 letter from Moraes to the Whites which defendants term the "Apology Letter" ("Exhibit B"); (3) the transcript of the August 20, 2020 phone call between Moraes and Mr. White ("Exhibit C"); (4) a criminal complaint filed with the Manhattan District Attorney on August 25, 2020 by the Whites' attorney against Moraes ("Exhibit D"); and (5) an August 25, 2020 text message exchange between Ms. White and Rafaella LaRoche, a friend of Moraes ("Exhibit E").  For the reasons that follow, the Court finds Exhibits B and C cognizable; Exhibit A cognizable in part; and Exhibits D and E not cognizable.

### 1.   Legal Standards

In general, in resolving a motion to dismiss under Rule 12(b)(6), a district court may consider only the allegations on the face of the complaint and the materials it attaches.  However, the court may permissibly consider extrinsic materials where such are incorporated by reference

---

[3] The exhibits attached to the FAC are, of course, cognizable. *See Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[A] complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); note 1, *supra*.

or where a document is one "upon which [the complaint] *solely* relies and which is *integral to the complaint.*" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis and modification in original); *see also Cummings v. City of New York*, No. 19 Civ. 7723 (CM) (OTW), 2020 WL 882335, at *3 n.2 (S.D.N.Y. Feb. 24, 2020) ("In reviewing a motion to dismiss, a court may consider, *inter alia*, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint without converting the motion to dismiss to a motion for summary judgment." (quoting *BankUnited, N.A. v. Merrit Env't Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018))).  For a document to be incorporated by reference, the complaint must make a "clear, definite and substantial reference to the document[]." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003).  For the document to be "integral," the complaint must "rel[y] heavily upon its terms and effects, and the plaintiff has actual notice of all the information in the documents and relied upon those documents in framing the complaint." *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 791 (S.D.N.Y. 2011) (internal citations omitted), *aff'd sub nom. Pujals v. Standard Chartered Bank*, 533 F. App'x 9 (2d Cir. 2013) (summary order).

### 2.   Application

Applying the standards set forth above, the Court finds only Exhibits B and C cognizable in full.  Exhibit B, the "Apology Letter" Moraes sent to Ms. White following her termination, is quoted in part in the FAC, and the FAC characterizes the balance of it as consisting of "heartfelt expressions of emotion about the trauma and how it had impacted Moraes and her behavior and her relationship with the family.  It gave no indication that Moraes would impose herself on the family, nor contact the family further in any way without explicit permission." *See* FAC ¶¶ 17–18.  To the extent that Exhibit B is both quoted in part and summarized in its entirety, the Court

considers it "integral" to the complaint, and therefore cognizable. *See, e.g., Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 161 (S.D.N.Y. 2015) (considering DVDs of 12 episodes of "Married at First Sight" cognizable where the contents were described in detail).

Exhibit C, the transcript of the phone call between Mr. White and Moraes, is cited and quoted extensively in the FAC. *See* FAC ¶ 23. And "Moraes concedes that, in fact, she relies heavily on the document." Opp. at 5. The Court therefore finds this document cognizable.

Exhibit A, the text message exchange between Moraes and Ms. White following Moraes' termination, is cognizable in part. The FAC alleges: "Following the termination of Moraes' employment, Ms. White acknowledged in writing that Barbara Moraes had been a 'wonderful caretaker.'" FAC ¶ 62. But, as Exhibit A shows, that statement comprised one phrase in a multi-paragraph text message. The Court therefore finds cognizable the paragraph in which the phrase is included, to allow for proper context. The entire paragraph reads: "I am happy to tell a potential employer what a wonderful caretaker you were. I cannot withhold what took place between us over the past few months, though I can tell them that up to your termination it did not impact the quality of your care." Kaufmann Decl., Ex. A. *Cf. Kelly v. N. Shore–Long Island Jewish Health Sys.*, 166 F. Supp. 3d 274, 284 (E.D.N.Y. 2016) (considering correspondence that was specifically referenced in the complaint, but excluding correspondence that was neither integral nor incorporated by reference).

Exhibits D and E are clearly not cognizable. The FAC makes only one reference to the Whites' criminal complaint. *See* FAC ¶ 29. The FAC quotes from the first Cease & Desist Letter from Kaufmann, which states, "I have filed a report of your communications and behavior with the Manhattan District Attorney and the police." *Id.* There is no allegation in the FAC that Moraes ever saw the criminal complaint or was aware of its contents. Likewise, Exhibit E, the

text message exchange between Ms. White and friend of Moraes is referenced only once in the complaint. The FAC alleges: "That evening, Moraes and the Whites communicated through an intermediary. Though it was an inconvenience to her, Moraes agreed to change her pharmacy and to minimize the time she spent in the Flatiron and Chelsea neighborhoods, to avoid further antagonizing the Whites." FAC ¶ 23. As with Exhibit D, the FAC does not make any allegation that Moraes was privy to the substance of the text message conversation between Ms. White and the intermediary; it states only that the conversation occurred. The FAC's solitary and glancing references to defendants' criminal complaint and to a defendant's communications with a third party—the substance of neither of which is Moraes alleged to have been aware at any point—are insufficient to make either Exhibit "integral" to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.") (emphasis in original); *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14 Civ. 7134 (VM), 2015 WL 4940126, at *8 (S.D.N.Y. Aug. 10, 2015). The Court therefore sets these Exhibits set aside.

**B.    Moraes' Defamation Claims**

Moraes brings three separate claims for defamation: based upon (1) Ms. White's January 7, 2021 post to the "Madison Square Moms" Facebook group; (2) Ms. White's January 9, 2021 post to the "Chelsea Mommas" Facebook group; and (3) the January 12, 2021 Cease & Desist Letter, which was taped to Moraes' door. Defendants move to dismiss each.

**1.    Legal Standards**

*a.    General Standards*

Defamation is the "making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of

16

right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996) (citations and quotations omitted). Under New York law, to state a claim for defamation, a plaintiff must allege "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

At the motion to dismiss stage, the court "must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury." *Id.* (citations and quotations omitted); *see also Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997) (in defamation cases, courts' "limited function" is to determine "as a matter of law whether the statements complained of are reasonably susceptible of a defamatory construction"). That determination is "guided not only by the meaning of the words as they would be commonly understood . . . but by the words considered in the context of their publication." *Levin*, 119 F.3d at 195 (citing *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381 (1995)). Allegedly defamatory statements must not "be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963)). A court may not "strain" to interpret statements in their most mild or defamatory sense. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013). Where the challenged statements are "susceptible of multiple meanings, some of which are not defamatory," the court may not conclude, as a matter of law, that the statements are or are not defamatory. *Celle*, 209 F.3d at 178 (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).

At the motion to dismiss stage, as to the element of falsity, "federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (collecting cases).

b.    *Opinion Statements*

Under New York law, statements of opinion are not actionable as defamation, "however unreasonable the opinion or vituperous the expression of it may be." *Davis*, 754 F.2d at 85 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)). Whether a challenged statement is an opinion is a question of law. *See id.* A statement of "pure opinion" is "'either accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts.'" *Biro*, 883 F. Supp. 2d at 461 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986) (citations and quotations omitted)).

The New York Court of Appeals has identified several factors to assist courts in distinguishing opinion statements from potentially actionable statements of fact:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167, 153 (N.Y. 1993) (alteration omitted) (citations and quotations omitted). "Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions." *Celle*, 209 F.3d at 178. However, statements of opinion that "impl[y] a basis in facts which are not disclosed to the reader or listener" may be actionable, "because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person

toward whom the communication is directed." *Gross*, 623 N.E.2d at 1168 (cleaned up); *Sang v. Hai*, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013). Such statements are referred to as "mixed opinion." *Chau v. Lewis*, 935 F. Supp. 2d 644, 658–59 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) (quoting *Steinhilber*, 501 N.E.2d at 553).

> c.    *Defamation* Per Se

Under New York law, to recover on a defamation claim, a plaintiff must either plead special damages or that the statements are defamatory *per se*. *Celle*, 209 F.3d at 179. Statements that are defamatory *per se* "are actionable without pleading and proof of special damages." *Id.* (citations and quotations omitted)). Two such categories of defamatory *per se* statements are those that "charge the plaintiff with a serious crime" and those that "tend to injure another in his or her trade, business or profession." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). However, as to statements regarding criminal conduct, "the law distinguishes between serious and relatively minor offenses." *Id.* "[O]nly statements regarding the former are actionable without proof of damage." *Id.* Whether a challenged statement constitutes defamation *per se* is a question of law. *Geraci v. Probst*, 15 N.Y.3d 336, 344 (2010).

> 2.    **Application to the Two Facebook Posts**

The January 7, 2021 post to the Madison Square Moms group and the January 9, 2021 post to the Chelsea Mommas group are identical, save that Ms. White added one line to the latter post: "We have no reason to believe she is violent or a danger to anyone else." FAC ¶ 43. The Court therefore considers these posts together.

Defendants argue that (a) these statements are non-actionable opinion, and that to the extent the posts contain facts, such facts are pled as true; (b) the FAC fails to plead fault; and (c) the posts are protected by a qualified privilege. The Court takes these arguments in turn.

a.    *Mixed Opinion Statements*

Defendants argue that the posts contain solely opinions about Moraes' behavior and are thus non-actionable.  MTD at 8.  Defendants assert that there is no factual dispute over the events at issue.  They cast Moraes as objecting instead to Ms. White's expression of her feelings about Moraes and the circumstances surrounding their termination of her as W.'s nanny.  *Id.* at 9.  According to defendants, Ms. White's posts "were made about a rocky employment relationship that ended badly."  *Id.* at 10.  Moraes counters that although Ms. White couched her statements regarding Moraes' behavior in opinion form, her posts implied that she "[knew] certain facts, unknown to [her] audience, which support [her] opinion[s] and are detrimental to the person about whom [s]he is speaking," *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 97 (2d Cir. 2017), and specifically implied historical criminal conduct and present criminal tendencies on Moraes' part.

The Court considers the import of the posts holistically, without attempting to artificially disentangle fact from opinion.  *See Levin*, 119 F.3d at 197 ("Instead of parsing out and evaluating the challenged statements in isolation, New York courts look to the immediate context and the broader social context of the statement, and evaluate the impact that the statements would have on a reasonable reader." (internal citations omitted)).  "At bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff."  *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008).

Important to this assessment, accusations of criminal or unethical activity, in particular, are considered expressions of fact.  *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 719 (S.D.N.Y. 2014) (collecting cases).  It is well established that accusations of criminality "[are] not transformed into a nonactionable expression of opinion merely because it is couched in the form of an opinion."  *Gross*, 623 N.E.2d at 1169.  On the other hand, New

York courts have found that "even when uttered or published in a more serious tone, accusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise based upon those facts." *Solstein v. Mirra*, 488 F. Supp. 3d 86, 98 (S.D.N.Y. 2020) (quoting *Gross*, 623 N.E.2d at 1169).

Those principles favor allowing Moraes' claims based on Ms. White's Facebook posts to move forward. Although Ms. White added to the January 9, 2021 post the lawyerly disclaimer that the Whites lacked "reason to believe that [Moraes] is violent or a danger to anyone else," the clear implication of both her posts is that she knew undisclosed facts supporting her contention that Moraes was a stalker and harasser to a degree worthy of arrest and prosecution. Indeed, her statement in each post that she and her husband had "no choice" but to file a criminal complaint against Moraes for stalking and harassment unavoidably conveys that this course of action was driven by facts known to them—*i.e.*, that they possessed evidence of Moraes' commission of these offenses worthy of a criminal complaint. *See Gross*, 623 N.E.2d at 1169 ("[I]f the statement 'John is a thief' is actionable when considered in its applicable context, the statement '*I believe* John is a thief' would be equally actionable when placed in precisely the same context."). Significant too, Ms. White held herself out in these posts as Moraes' former employer. As such, her forcefully put statements of opinion—that her former nanny merited prosecution for stalking and harassment—conveyed to the Facebook group that she had personal knowledge of the crimes that she had reported to the authorities. In particular, Ms. White's statements suggested that the opinion she volunteered to the effect that Moraes had criminal culpability was based on Moraes' conduct towards her young son—a "statement of fact that may

be proven or disproven." *Germain v. M&T Bank Corp.*, 111 F. Supp. 3d 506, 536 (S.D.N.Y. 2015) (citation omitted); *Solstein*, 488 F. Supp. 3d at 98.

On the Whites' motion to dismiss, with the cognizable facts viewed in the light most favorable to the non-movant, Moraes, Ms. White's implied allegation against Moraes must be treated as false. That is because Moraes' FAC denies that she had engaged in harassment or stalking towards W., that she had ever sought out W. following her termination, that she had assented to Mr. White's insistent demand that she avoid the Whites' neighborhood, or that any competent legal authority had ever barred her from that neighborhood. FAC ¶ 30 (alleging that Moraes had had one—happenstance—encounter with W. after the Whites terminated her); *id.* ¶ 39 (indicating that Moraes had had only one additional encounter with W. in the park after Mr. White on August 20, 2020 instructed her to stay away); *id.* ¶ 37 (denying ever conveying to the Whites that she would not seek employment in the neighborhood, or knowing of any basis for a restraining order against her); *id.* ¶ 43 (denying that Moraes was violent or a danger to W.).[4] And where "the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity, the opinion may be an actionable defamatory opinion." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) (citation and alteration omitted); *see also Dworin v. Deutsch*, No. 06 Civ. 13265 (PKC), 2008 WL 508019, at *3 (S.D.N.Y. Feb. 22, 2008) (where "both the opinion and the facts upon which it is based are false, the opinion and facts may

---

[4] As noted, Cohen's message to Kulka can be read to imply that Moraes encountered W. after the August 20, 2020 encounter at the playground, at some point after Moraes began work for the Cohen-Glassbergs. *See* note 2, *supra*. The FAC, however, alleges the contrary. *See* FAC ¶¶ 33, 48. Regardless, the fact of an additional encounter would not establish harassment or stalking by Moraes or a breach of a promise by her to the Whites. Discovery will test the extent and nature of any post-employment contact by Moraes with W.

form the basis of a defamation claim"); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) ("[W]here the plaintiff alleges that both the opinions and facts are false, a motion to dismiss should not be granted, and the plaintiff may proceed against both the statements of fact and opinion."); *Silsdorf v. Levine*, 449 N.E.2d 716, 720. (N.Y. 1983) (reinstating defamation claim based on letter accusing former mayor of corruption where facts that formed alleged basis for claim of such corruption were allegedly false).

Defendants argue for dismissal on the ground that Ms. White's Facebook posts were necessarily non-actionable statements of opinion. They characterize Ms. White's posts as expressing only her ruminations about "a rocky employment relationship that ended badly." MTD at 10. But reading the posts in full, a reasonable reader could reject that characterization. In addition to terming Moraes a harasser and stalker worthy of a criminal referral based on her apparent personal knowledge, Ms. White overtly sought out "additional information" from the Facebook group, with the evident purpose to protect her family from the ongoing threat that Moraes ostensibly posed and/or to fortify her criminal complaint against Moraes.

Important, too, Ms. White's January 2021 posts about Moraes were made some six months after, according to the posts, Moraes had ceased nanny work for the Whites. Far from suggesting an employer venting about an employment relationship that had recently ended tumultuously, Ms. White's warnings about Moraes' capacity to stalk and harass—coupled with her urgent solicitation of information—a half-year after Moraes' discharge, could fairly be read to convey that the purportedly obsessive former nanny posed a continuing if not escalating danger. A reasonable reader could readily conclude that only a person with a solid factual basis to fear such stalking would call out a former nanny as a stalker and harasser in a post to thousands of other parents of young children.

23

Defendants next argue that the forum in which the posts were made—the Internet—made the statements protected opinion. Quoting *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, defendants argue, "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016). That argument also overreaches as a basis for dismissal on the pleadings. *Bellavia* itself noted significant exceptions to this pattern of rulings, two of which could be found squarely to apply to Ms. White's public screeds about Moraes. First, "[i]f the comments were based on undisclosed facts, such comments could certainly be defamatory." *Id.* Such is fairly inferred here, in that, as noted, Ms. White's statements imply first-hand knowledge of facts supporting her expressed opinion that stalker and harasser Moraes posed a danger to her family. By contrast, in *Bellavia*, the allegedly defamatory comments were explicitly based on mere *rumors* the defendant had heard. *Id.* at 296. Second, the context in which the online communications were made matters. In *Bellavia*, the defendant had responded to a prompt overtly soliciting opinions: "Have an *opinion* about this story? Click here to submit a Letter to the Editor, and we may publish it in print. Or submit an online comment below." *Id.* (emphasis added). Nothing about the entreaty to which the *Bellavia* defendant responded suggested that the opinion had a basis in fact. Here, in contrast, Ms. White, unprompted, posted twice about Moraes. In each case, she referenced her personal experience and put out a call for additional factual information. To a reasonable reader, Ms. White's posts, given their context, could be read not as fact-free Internet bloviating, but as connoting genuine fear and urgency based on facts known to her.

Defendants finally argue that any factual statements implied by Ms. White's posts are true. Although defendants are at liberty to attempt to establish in discovery that, for example,

Moraes had sought out W. following her termination under circumstances indicative of stalking and harassment, their characterization of the FAC as admitting such is far off base. Quite to the contrary, the FAC specifically alleges that numerous aspects of Ms. White's posts were false, including their central characterization of Moraes as a persistent and ongoing stalker of W. *See* FAC ¶¶ 33–38.

The Court therefore holds that Ms. White's Facebooks posts are actionable as mixed opinion statements which are adequately alleged to have been false and defamatory.

### b. Fault

Defendants next argue that the FAC fails to adequately plead Ms. White's fault in publishing the two posts. MTD at 15. They argue that Moraes was required to plead "actual malice" on her part, because the posts related to a matter of public concern. *Id.*

The Court holds that the FAC has pled the level of fault required, which is below that which defendants posit. In cases brought by private figure plaintiffs involving statements not related to a matter of legitimate public concern, a plaintiff need plead only that the defendant was negligent in making the statements. *Celle*, 209 F.3d at 176; *Goldman v. Reddington*, 417 F. Supp. 3d 163, 173 (E.D.N.Y. 2019). However, when a plaintiff claiming defamation is a private figure and the allegedly defamatory statements relate to a matter of legitimate public concern, the plaintiff must plead that the defendant acted "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.S.2d 196, 199 (N.Y. Fam. Ct. 1975); *Pollnow v. Poughkeepsie Newspapers, Inc.*, 486 N.Y.S.2d 11 (N.Y. App. Div. 1985), *aff'd*, 492 N.E.2d 125 (N.Y. 1986) (applying *Chapadeau* standard to non-media defendant). That standard imposes a higher bar than negligence, but a lower one than actual malice, the standard applicable to defamation claims by public figures. It calls for an objective,

rather than subjective, assessment. *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 502

(S.D.N.Y. 2019); *Gaeta v. N.Y. News, Inc.*, 465 N.E.2d 802, 806 (N.Y. 1984) (*Chapadeau*

standard "may be satisfied by wholly objective proof"); *Treppel v. Biovail Corp.*, 233 F.R.D.

363, 376 (S.D.N.Y. 2006) ("Under *Chapadeau*, the evaluation of a defendant's level of fault—

whether its conduct in publishing defamatory statements was grossly irresponsible—is an

objective determination.").

        To determine whether allegedly defamatory statements relate to a matter of legitimate

public concern, New York courts view the statements in context of the writing as a whole.

*Huggins v. Moore*, 726 N.E.2d 456, 460 (N.Y. 1999).  The inquiry is whether the matter can be

"fairly considered as relating to any matter of political, social, or other concern of the

community" and distinguish this broad category of newsworthy matters from "mere gossip and

prurient interest." *Id.*  Defendants argue Ms. White's posts so qualified, because the posts

addressed a matter of community safety.[5]

        There is no occasion for the Court to resolve the issue at this stage.  Even if the more

demanding *Chapadeau* standard of fault applied, the FAC meets it.  It squarely alleges that Ms.

White knowingly and intentionally made the allegedly false accusations about Moraes, and that

she did so to deter other families in the neighborhood from hiring Moraes, whom she wished for

her own reasons to keep far away. *See, e.g.*, FAC ¶¶ 65–67; 77–79.  These factual allegations

must be taken as true on a motion to dismiss.  In all events they are plausible, including in light

of the FAC's allegation that—contrary to Ms. White's accusation—Moraes had not had more

than chance contact with W. since her termination. *See Pollnow*, 486 N.Y.S.2d 11 (plaintiff

---

[5] This characterization is in some tension with defendants' characterization elsewhere of Ms.
White's posts as merely reflecting her feelings about the termination of her nanny's employment.

satisfied the "minimum requirements for stating a cause of action" by alleging that "defendant acted negligently, maliciously and with a reckless disregard for the truth"), *aff'd*, 492 N.E.2d 125 (N.Y. 1986). "Intentional lies not only satisfy, but surpass, the culpability of 'gross irresponsibility,' which signifies 'something more than . . . negligence.'" *Goldman*, 417 F. Supp. at 175 (quoting *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875 (N.D.N.Y. 1994), *aff'd*, 112 F.3d 504 (2d Cir. 1996).

Accordingly, the FAC adequately alleges that Ms. White acted with the requisite level of fault.

### c. *Qualified Privilege*

Finally, defendants argue that the posts are protected by a qualified privilege—the common-interest privilege. MTD at 14. In light of the well-pled facts as to the circumstances and context of the posts, however, that privilege does not apply.

New York law recognizes—in addition to the defense of truth—certain qualified privileges that may immunize a declarant from liability for a defamatory statement. *Conti v. Doe*, No. 17 Civ. 9268 (VEC), 2021 WL 1578047, at *11 (S.D.N.Y. Apr. 22, 2021) (collecting cases). The common-interest privilege "extends to a communication made by one person to another upon a subject in which both have an interest." *Liberman*, 605 N.E.2d at 349. The privilege has limited application. It applies only to communications that are "published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000) (citation omitted); *see also Conti*, 2021 WL 1578047, at *12 n.18 (collecting cases suggesting privilege typically applies only to workplace communications). "To invoke the privilege, the parties need only have such a relation to each

other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Scott v. Thayer*, 75 N.Y.S.3d 603, 605 (N.Y. App. Div. 2018).

Here, defendants argue the common-interest privilege shelters Ms. White's posts because they were made in two Facebook groups in which "parents seek advice and opinions from other local parents who rely on members' honesty." MTD at 14. But for at least two reasons, the common-interest privilege, based on the pleadings, does not protect Ms. White's statements.

First, there is no indication, based on the posts themselves, that any other person in the group shared Ms. White's interest in Moraes or her behavior. All indications are that Ms. White wrote the posts on her initiative, unprompted by an inquiry or comment by another member of the group. And Ms. White's account focused on Moraes' behavior towards W. only. Indeed, in an apparent, if misguided, attempt to guard against legal liability, Ms. White added the ostensible disclaimer to the second post that: "We have no reason to believe that she is violent or a danger to anyone else." Further, Ms. White concluded both posts by soliciting *private* responses to her personally ("DMs" or direct messages) for more information. Fairly read, the posts each were constructed for Ms. White's benefit—to gather information relating to a matter affecting her family, and, evidently, to deter other mothers in the neighborhood from hiring Moraes.

Second, the Facebook groups to which Ms. White posted were neither "extremely limited" nor "clearly defined." The FAC alleges that the "Madison Square Moms" Facebook group had 2,300 members, FAC ¶ 34, and that the "Chelsea Mommas" Facebook group had 6,000 members, *id.* ¶ 43. Given the groups' sizes, defendants' suggestion that Ms. White shared an "immediate relationship" with each member, or that each member shared the same interests, is unpersuasive.

On the facts pled, the common-interest privilege thus does not protect Ms. White's posts.

3.      **Application to the January 12, 2021 Cease & Desist Letter**

The FAC alleges that the Whites sent Moraes two Cease & Desist letters through attorney Kaufmann, and that the second, dated January 12, 2021, which was posted on Moraes' front door and visible to passersby, was defamatory. FAC ¶ 45. This letter contained express assertions of fact. The FAC alleges that the letter's factual statements (1) that Moraes had had contact with W. after the Whites had warned her not to in the August 20, 2020 phone call, and (2) that Moraes had been fired from earlier jobs for "problematic and disruptive behavior" were defamatory. *Id.* ¶ 48. In pursuing dismissal, defendants argue that the FAC does not adequately plead falsity or fault, and that the letter is protected by a qualified privilege. MTD at 17.

*a.      Falsity*

In arguing that the Cease & Desist Letter's first factual assertion was true, the Whites rely on the text message from Cohen, *see* FAC ¶ 39, which implies that there was contact between Moraes and W. after Moraes began work for the Cohen-Glassbergs.[6] *See* MTD at 17. The Whites, therefore, construe the FAC to admit a post-termination encounter between Moraes and W. after August 20, 2020. The FAC denies this. *See* FAC ¶¶ 33, 48. However, at oral argument, counsel for Moraes acknowledged that there appeared to have been an encounter, albeit a benign one, between Moraes and W., after August 20, 2020. The Court accordingly treats Moraes as having dropped this factual assertion as a basis for the defamation claim.

However, the second factual assertion in the Cease & Desist Letter, regarding Moraes' employment history, is well-pled as false. The letter states that Ms. White had spoken to a

---

[6] As they note, Cohen's text message responding to Ms. White's Facebook post—to the Facebook group administrator—stated that: "My mom was with Barb when this supposed issue happened and it was nothing more than a little boy who liked his former nanny saying hi." FAC ¶ 39; *see also* note 2, *supra.*

former employer who recounted Moraes' "problematic and disruptive behavior." The FAC

squarely alleges this claim to be false. FAC ¶ 48.

       *b.*     *Fault and Qualified Privilege*

Defendants next argue that, as to the Cease & Desist Letter, the FAC does not adequately

plead "fault" and that, based on the pleadings, the letter was protected by the qualified privilege

for pre-litigation communications. Neither argument succeeds.

The FAC adequately pleads fault, in that it alleges that the Whites' agent, Kaufmann,

knowingly and intentionally made the false statements in the letter about Moraes' problematic

and disruptive job history. *Id.* ¶¶ 89–91.

And the Whites' attempt to invoke the pre-litigation privilege on the pleadings is easily

set aside. Under New York law, "statements made prior to the commencement of an anticipated

litigation are privileged . . . ." *Front v. Khalil*, 28 N.E.3d 15, 19 (N.Y. 2015). For the privilege

to apply, "the recipient of the challenged statements [need not] . . . be a lawyer or potential

party." *Feist v. Paxfire, Inc.*, No. 11 Civ. 5436 (LGS), 2017 WL 177652, at *5 (S.D.N.Y. Jan.

17, 2017); *see also Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) (summary order)

("Even crediting [the plaintiff's] allegation that [the attorney defendant] shared the affidavit with

the Daily News before filing it in court, [the plaintiff] has still not sustained his burden of

showing that the statements were not pertinent to a good faith anticipated litigation."). But the

privilege is lost where the statements were "not pertinent to a good faith anticipated litigation,"

*Tacopina*, 645 F. App'x at 8, such as when an attorney uses the communications to "bully,

harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting

wholly unmeritorious claims," *Front*, 28 N.E.3d at 19, or "when such statements are spoken with

malice, knowledge of their falsity, or reckless disregard for their truth," *Giuffre v. Maxwell*, No. 15 Civ. 7433 (RWS), 2017 WL 1536009, at *8 (S.D.N.Y. Apr. 27, 2017) (quotations omitted).

Here, the FAC pleads that the Cease & Desist Letter, and the allegations falsely tarring Moraes therein, were part of a "campaign of harassment against [her]" by the Whites to try to bully Moraes into leaving the Chelsea neighborhood. FAC ¶¶ 48; 52–53. Taking these allegations as true, the Letter was not sent in anticipation of good faith litigation.[7] The privilege cannot be found, at this stage, to apply.

### C.    Interference with Business Relations Claim

#### 1.    Legal Standards

The FAC brings a claim for "tortious interference of contract," based on Ms. White's alleged interference with Moraes' employment with the Cohen-Glassbergs.

Under New York law, the elements of tortious interference with contract are: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006). "In addition, the plaintiff must assert, with respect to each defendant, that the defendant's actions were the 'but for' cause of the alleged breach—in other words, that there would not have been a breach but for the activities of the defendant." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009) (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also White Plains Coat & Apron Co.*, 460 F.3d at 285 ("[W]hen there is knowledge of a contract, and a competitor takes an active part in

---

[7] Although unnecessary to this decision, the Whites' lawyer's attempt, as pled, to pressure Moraes from entering an entire Manhattan neighborhood ("There simply is no reason for you to go to my client's neighborhood," FAC ¶ 46), far from being part of a litigation strategy, would not appear to have any basis in law.

persuading a party to the contract to breach it by offering better terms or other incentives, there is an unjustifiable interference with the contract." (quoting *State Enters., Inc. v. Southridge Co-op. Section 1, Inc.*, 238 N.Y.S.2d 724 (N.Y. App. Div. 1963))).

A plaintiff whose employment relationship was terminable at will, and thus lacked a valid, enforceable contract—as Moraes admits was the case with her employment with the Cohen-Glassbergs—must plead facts to support a claim of *tortious interference with business relations* to state a claim.[8]  That is because at-will employees are considered to have *prospective* contractual rights with their employer, and must therefore plead wrongful conduct on the defendant's part in terminating such prospective rights.  *Smith v. Meridian Tech., Inc.*, 861 N.Y.S.2d 687, 687 (N.Y. App. Div. 2008); *Gortat v. Capala Bros.*, No. 07 Civ. 3629 (ILG) (SMG), 2011 WL 6945186, at *4 (E.D.N.Y. Dec. 30, 2011) ("As compared to the tort of tortious interference with contract, '[w]here there has been no breach of an existing contract, but only interference with prospective contract rights . . . plaintiff must show more culpable conduct on the part of the defendant.'").

Accordingly, in order to sustain a claim of tortious interference with business relations, Moraes must plead that: (1) she had a business relationship with a third party (*i.e.*, the Cohen-Glassbergs), (2) the Whites interfered with the relationship, (3) the Whites acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the interference caused injury to the employment relationship.  *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008); *Gortat*, 2011 WL 6945186, at *4.

---

[8] Because the two have been referred to as the same tort, *see Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011), including by this Court, *see Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909 (PAE) (KNF), 2021 WL 2041639, at *8 (S.D.N.Y. May 21, 2021), the Court construes the FAC's tortious interference with contract claim as a claim of tortious interference with business relations.

Salient here, the use of wrongful or improper means generally amounts to conduct "that amount[s] to a crime or an independent tort," *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004), including "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure,'" *id.* at 1104 (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 428 N.Y.S.2d 628 (1980)).

### 2.   Application

The FAC pleads facts that plausibly allege that the Whites interfered with her employment relationship with the Cohen-Glassbergs.

First, it adequately alleges an employment relationship with the Cohen-Glassbergs, albeit not one entailing a contract. FAC ¶ 32. *See Wright v. Cayan,* 817 F.2d 999, 1002 (2d Cir. 1987) (under New York law, employment is at-will unless the duration of an employment contract is set forth explicitly). The Court therefore construes the FAC to plead an at-will employment relationship.

Second, it pleads that Ms. White interfered with that relationship. Ms. White posted to two different Facebook groups, at least one of which Moraes's employer, Cohen, was a member. *See* FAC ¶ 39 (alleging Cohen sent Facebook group administrator a message asserting that the post to the Madison Square Moms group "spread defamation"). The Facebook post, alone, would not establish interference, because, as defendants rightly note, Cohen responded to White's the original post by defending—not terminating—Moraes. *See id.* (Cohen responding that, "I understand that there are two sides to every story . . . ."). But the FAC also alleges, on information and belief, that Ms. White did more to poison Cohen:

> Ms. Cohen had spoken to [Ms. White] in the preceding days [before January 12, 2021], during which call Ms. White recounted to Ms. Cohen such falsehoods as that Moraes had stalked and harassed her child as well as other children. Upon information and belief, Ms. White placed the call to Ms. Cohen with a view toward procuring the termination of Moraes' employment at the Cohen-Glassbergs.

*Id.* ¶¶ 50–51.

In attacking this allegation, defendants fault the FAC for relying on Moraes' "information and belief" to establish that there was a phone call between Ms. White and Cohen along these lines. They argue that Moraes must plead more to sustain such a claim. That critique is wide of the mark, as the assembled facts pled here supply a sufficient basis for Moraes to conclude that such a phone call occurred. A plaintiff may plead facts on information and belief "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted). In particular, the FAC alleges that Cohen posted the following to the Facebook group, explaining Moraes' termination:

> We had to part ways unexpectedly today with our current nanny due to a problem she was having with her previous employer. She received a cease and desist order this morning and **a restraining order is following**.

FAC ¶ 53. Tellingly, although the FAC alleges that Moraes shared with Ms. Cohen that she received the Cease & Desist Letter, that letter does not indicate that the Whites would be seeking a restraining order. *See id.* ¶¶ 46, 49. And the FAC does not allege any basis for Moraes to have known about a future restraining order. Under these circumstances, it is highly plausible that Cohen's source of knowledge that "a restraining order is following" was a conversation with Ms. White, whom Cohen had earlier sought to sour on Moraes. And as to the other contents of such a call, such facts are "peculiarly within the possession and control of the defendant" and Cohen, and will be developed in discovery. Given the FAC's overall factual allegations, which reflect a persistent willingness on Ms. White's part to depict Moraes as unstable or worse to present and prospective employers, the FAC adequately pleads that a call of this nature occurred.

Third, the FAC pleads that the Whites used wrongful means in procuring Moraes' termination. Specifically, the FAC states, "Ms. White recounted to Ms. Cohen such falsehoods

as that Moraes had stalked and harassed her child as well as other children.  Upon information and belief, Ms. White placed the call to Ms. Cohen with a view toward procuring the termination of Moraes' employment at the Cohen-Glassbergs." *Id.* ¶ 50.  Conduct "that amount[s] to . . . an independent tort," *Carvel Corp.*, 818 N.E.2d at 1103, can form the basis of the "wrongful means" necessary to establish this element.  For the reasons reviewed, the FAC adequately alleges that the Whites' claims that Moraes stalked and harassed W.—or any other charge—are defamatory.  The FAC therefore adequately pleads this element as well.

Finally, the FAC alleges that Ms. White's interference caused Moraes' termination. Specifically, it alleges, "For no reason other than her fear of becoming involved in the Whites' harassment campaign, Cohen terminated Moraes's employment."  FAC ¶ 53.  To this end, the FAC also quotes from Cohen's Facebook post, which states:

> We had to part ways unexpectedly today with our current nanny due to a problem she was having with her previous employer. She received a cease and desist order this morning and a restraining order is following. It is unfortunate as our daughter loved her and she was very nice but **we did not feel comfortable with the drama and situation . . . .**

*Id.*  Although the FAC leaves opaque whether Cohen credited Ms. White's factual assertions about Moraes or merely terminated her as a result of the fallout—the "drama and situation"— between Moraes and the Whites, it unmistakably alleges that Ms. White's interference caused her termination.  Thus, the FAC pleads this last element, too.

The Court accordingly sustains this claim.

### D.     Intentional Infliction of Emotional Distress

The Court next addresses Moraes' claim for intentional infliction of emotional distress ("IIED").  The defendants move to dismiss the IIED claim on the grounds that the FAC does not allege, as required, extreme and outrageous conduct or that Moraes suffered harm as a result of defendants' conduct.  *See* MTD at 24.

To plead an IIED claim under New York law, a plaintiff must allege "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)); *accord Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). These requirements, especially that of extreme and outrageous conduct, "are rigorous and difficult to satisfy." *Howell*, 612 N.E.2d at 702; *see also Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983) (describing IIED as a "strict standard"). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Chanko v. Am. Broadcasting Cos.*, 49 N.E.3d 1171, 1179 (N.Y. 2016) (quoting *Howell*, 612 N.E.2d at 702).

Conduct may be "extreme and outrageous" where "there is a deliberate and malicious campaign of harassment or intimidation." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122–23 (2d Cir. 2019) (quoting *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (N.Y. App. Div. 2018)). Under New York law, the proper inquiry is not merely whether an individual act might be outrageous, but whether the action in totality amounted to a deliberate and malicious campaign. *Id.* at 123. Where a defendant knows of a plaintiff's susceptibility to emotional distress, non-actionable acts may be transformed into outrageous conduct. The Restatement (Second) of Torts § 46, to which New York adheres, *see Howell*, 612 N.E.2d at 699, states "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress." Otherwise non-actionable conduct "may become heartless, flagrant, and outrageous when the actor proceeds in the face of such

knowledge." *Rich*, 939 F.3d at 123 (quoting Restatement (Second) of Torts § 46 (comment *f*) (1965)).

Here, the FAC plausibly alleges what amounted to a multi-pronged campaign to harass Moraes, with the goal of driving her far away from W. It alleges that the Whites took these steps, in spite of—or to capitalize on—what they knew to be Moraes' emotionally vulnerable state. *See* FAC ¶¶ 14–16 (alleging the Whites' knowledge that Moraes was suffering from emotional distress after having been the victim of a violent attack in April 2020, and Moraes having confided in Ms. White about her struggles and treatment in the attack's aftermath). In particular, it alleges:

- After a chance encounter with W. following her termination, the Whites demanded that Moraes leave the Chelsea neighborhood, notwithstanding the absence of any conceivable legal justification for demanding that she do so. *Id.* ¶¶ 5, 12, 22–23.

- The Whites further threatened to have law enforcement arrest Moraes despite— as pled—Moraes not having violated any provision of law or restraining order. *Id.* ¶¶ 22–24.

- The Whites then served a Cease & Desist Letter on Moraes by having an agent of theirs sneak into Moraes' building, and loudly and persistently bang on her door, until Moraes relented and permitted him inside her apartment. *Id.* ¶¶ 26– 28. That agent then threatened Moraes' immigration status. *Id.* ¶¶ 28–29.

- The Whites' Cease & Desist Letter further notified Moraes that their lawyer had filed a complaint with the district attorney and the police. *Id.* ¶ 29.

- In posts evocative of the occasional sensational account—in fact and fiction—of a nanny gone rogue,[9] Ms. White also twice posted to Facebook groups comprising Moraes' potential employers (Manhattan mothers) the false claim that Moraes had stalked and harassed her child. The second of these falsely implied that—while Moraes was not a known threat to others—she posed a risk of violence toward W. *Id.* ¶¶ 34, 43.

- The Whites next sent two more agents to Moraes' building, who, after arriving in the early morning, banged on her door for two hours. *Id.* ¶ 45. When Moraes finally emerged to go to work, one agent followed her to the subway and "harangue[d]" her on the way. *Id.*

- When Moraes returned home later that day, she discovered that a second Cease & Desist Letter from the Whites' lawyer had been taped to her door. The letter contained falsehoods, including that Moraes had stalked and harassed another child (in addition to W.). *Id.* ¶ 46. This letter was taped to the door in a manner that any of Moraes' neighbors walking by could read it. *Id.* ¶ 47.

These factual allegations, taken together, plausibly allege extreme and outrageous conduct on the part of the Whites.

As for the defendants' argument that the FAC fails to plead harm, it is baseless. The FAC squarely alleges, "The Whites' campaign of harassment against Moraes as detailed in this

---

[9] *See, e.g.*, *Law & Order Special Victims Unit: Shaken* (NBC television broadcast Nov. 25, 2003) (nanny accused of killing toddler); James C. McKinley Jr. and Jan Ransom, *Manhattan Nanny Is Convicted in Murders of Two Children*, N.Y. TIMES (Apr. 18, 2018), https://www.nytimes.com/2018/04/18/nyregion/nanny-trial-verdict.html; *see also The Hand That Rocks the Cradle* (Hollywood Pictures et al. 1992) (psychological thriller featuring nanny who seeks to ruin lives of family for whom she works).

Complaint caused Moraes to suffer persistent extreme anxiety and fear, for which she was prescribed medication, as well as insomnia and disordered eating." *Id.* ¶ 55. Defendants assert that the FAC fails to distinguish "between Ms. Moraes' preexisting extreme distress symptoms and those alleged to have been caused by the Whites," but the absence of such an allocation is not a basis for dismissal given the well-pled and plausible allegations that the Whites' aggressive actions toward Moraes worked harm.

The Court accordingly denies the motion to dismiss the IIED claim.

## CONCLUSION

For the foregoing reasons, the Court denies the motion to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 15.

The case remains in discovery pursuant to the Court-approved case management plan, with fact discovery due to end on February 11, 2022. *See* Dkt. 26.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 22, 2021
New York, New York

39